```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                       FORT MYERS DIVISION

EMPLOYERS INSURANCE COMPANY
OF WASAU, as subrogee of
INLAND PRIVATE CAPITAL
CORPORATION, and CERTAIN
UNDERWRITERS OF LLOYD'S,
LONDON, Subscribing to
Policy No.: YAC-L9L-470451-
012, as subrogee of INLAND
PRIVATE CAPITAL
CORPORATION,

        Plaintiffs,

v.                              Case No:  2:23-cv-773-JES-NPM

BL COMPANIES, INC., ROGERS
MECHANICAL CONTRACTORS FL
3, LLC, TRANE U.S., INC.,
and KHARL RODRIGUEZ,

        Defendants.

&

ROGERS MECHANICAL
CONTRACTORS FL 3, LLC,

        Cross-Claimant
        and Cross-
        Defendant,

v.

TRANE U.S., INC.,

        Cross-Claimant
        and Cross-
        Defendant.

&

TRANE U.S., INC.,
```

Third-Party
Plaintiff,

v.

FATH, INC.,

Third-Party
Defendant.

_____

### OPINION AND ORDER

This dispute involves small metal parts called roller cams which were used in the latch assemblies of access panels to the compressor compartments of Trane Rooftop Commercial HVAC units ("RTUs"). Thirty RTUs, some of which weighed 20 tons, were installed on the roof of an approximately 280,000 square foot warehouse built in the Fort Myers, Florida area to serve as an Amazon Sort Center (the "Sort Center"). The access panels of many of the 20-ton RTUs were blown off by high winds during Hurricane Ian. The affected units were then further damaged by exposure to the elements. In addition, the Sort Center's roof system was damaged by flying metal debris and its interior was damaged by the resulting water seepage.

Pursuant to an insurance policy, Plaintiffs Employers Insurance Co. of Wasau ("Employers") and Certain Underwriters at Lloyd's London ("Underwriters") paid about $4,000,000 to Inland Private Capital Corp. ("IPC"), the Sort Center's beneficial owner.

Employers and Underwriters (collectively "Subrogees") assert

that the access panels failed because there were defects in the
roller cams of the affected RTUs' latch assemblies. Subrogees
sued entities or persons involved in the design, manufacture,
assembly, and installation of the RTUs, some of whom then sued
each other. For purposes of the pending motion, the Third Amended
Complaint ("TAC") (Doc. #116) is the operative pleading.[1]

This matter now comes before the Court on the Motion for
Summary Judgment (Doc. #141) of Defendant BL Companies, Inc.
("BLC"), filed on October 14, 2024. Subrogees filed a Memorandum
in Opposition (Doc. #155) on November 5, 2024; BLC filed a Reply
in Support (Doc. #160) on November 19, 2024; and with leave of
Court Subrogees filed a Sur-Reply (Doc. #170) on December 10, 2024.

For the reasons set forth below, BLC's Motion for Summary
Judgment (Doc. #141) is **DENIED.**

### I.

Summary judgment is appropriate only when the Court is
satisfied that "there is no genuine dispute as to any material
fact and that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if
the record taken as a whole could lead a rational trier of fact to
find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us,

---

[1] Because we are proceeding on a third amended complaint, which
has not been the subject of a prior summary judgment motion by
BLC, the Court declines Plaintiffs' invitation (Doc. #155, pp. 2-
3) to restrict the scope of the current motion.

Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, a court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296–97 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")).  "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment."  Allen v. Bd. of Pub. Educ., 495 F.3d 1306,

1315 (11th Cir. 2007).

## II.

### A. Summary of Relevant Material Facts

The relevant undisputed material facts, and the disputed facts viewed most favorably to the non-movants, are summarized as follows:

#### (1)  Identification and Roles of Plaintiffs

GPF-Seefried Ft. Myers LLC ("GPF"), d/b/a Seefried Industrial Properties, was the predecessor-in-interest to Inland Private Capital Corp. ("IPC"), a Delaware corporation.  IPC became the Sort Center's beneficial owner after a merger.

GPF obtained insurance Policy No. YAC-L9L-47051-012-00 (the "Policy") from Employers covering certain perils and damages at the Sort Center.  Underwriters, a foreign insurer, subscribed[2] to the Policy.  After Hurricane Ian damaged the RTUs and the Sort Center, Employers and Underwriters paid IPC in excess of $1.7 million and $2.2 million, respectively.  After the payments, IPC's

---

[2] A subscription policy is one in which multiple "underwriters or insurers agree to be liable for a designated portion or percentage of the coverage, in exchange for the receipt of a corresponding percentage of the premium payments. As such, individual subscribers to the Policy are separately liable only for their proportionate share of a particular loss, and are not jointly and severally liable." Lakehead Pipe Line Co., Inc. v. Am. Home Assur. Co., 981 F. Supp. 1205, 1208 n.1 (D. Minn. 1997). Subscribing to insurance thus seems to be roughly akin to a bookmaker laying off bets, as described in United States v. Milton, 555 F.2d 1198, 1200 (5th Cir. 1977) and United States v. Box, 530 F.2d 1258, 1261-62 (5th Cir. 1976).

interest in any claims belonged to Employers and Underwriters by

subrogation.[3]  Employers and Underwriters are pursuing the claims

in the TAC as subrogees.

### (2)  Identification and Roles of Defendants

GPF retained BL Companies, Inc. ("BLC"), a Connecticut

corporation, to provide architectural, mechanical, engineering,

and plumbing design services for the Sort Center.  Among other

things, BLC created plans and specifications for the Sort Center's

design and construction and selected the RTUs' make and model.

GPF hired The Conlan Company ("Conlan") as the general

contractor for the Sort Center construction project.  Conlan

retained Defendant Rogers Mechanical Contractors Fl 3 LLC

("Rogers") for mechanical contractor services, which included

installing the RTUs on the Sort Center's roof.

Rogers in turn contracted with Defendant Trane U.S. Inc.

---

[3] "Subrogation is the substitution of one person in the place
of another with reference to a lawful claim, demand or right, so
that he who is substituted succeeds to the rights of the other in
relation to the debt or claim, and its rights, remedies, or
securities. Subrogation is either 'legal' or 'conventional.'
Legal subrogation is an equitable doctrine and arises by operation
of the law without any agreement to that effect between the
parties; conventional subrogation rests on contract, arising where
an agreement is made that the person paying the debt shall be
subrogated to the rights and remedies of the original creditor."
Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1287 (11th
Cir. 2007) (internal citations and punctuation omitted.)  An
insurer has no subrogation rights until the claim has been paid.
Universal Prop. & Cas. Ins. Co. v. Laguna Riviera Condo. Ass'n,
Inc., 386 So. 3d 629, 632 (Fla. 2d DCA 2024).

("Trane"), a Delaware corporation, to select, sell, and deliver
thirty RTUs to the Sort Center.  Trane manufactures and sells
heating, ventilation, air-conditioning, and refrigeration ("HVAC")
systems for residential, commercial, and industrial use.

Trane, in turn, contracted with Fath, Inc. ("Fath"), the
manufacturer of the RTUs' latch assemblies.  Trane filed a Third-
Party Complaint (Doc. #200) against Fath on March 5, 2025.

### (3)  The GPF - BLC Contract

On October 26, 2020, GPF and BLC entered a contract (the
"Contract").  (Doc. #142-9.)  The Contract was based on a standard
form, AIA® Document B102™-2017, but the parties made many additions
and deletions.  (Id. at 11-20.)  In the Contract, GPF is referred
to as the Owner and BLC is referred to as the Architect.

### (4)  The GPF - Employers/Underwriters Insurance Policy

Employers issued GPF a property insurance Policy, to which
Underwriters is a subscriber.  (Doc. #116, ¶¶ 1-2.)  The TAC
alleges that Employers and Underwriters have subrogation rights in
equity and law (under the Policy's express terms) to recover
payments issued under the Policy.  (Id. at ¶¶ 30-32.)[4]

### (5)  Completion of Construction and GPF/IPC Merger

Construction at the Sort Center was completed before any
Hurricane Ian loss occurred.  The Sort Center was inspected for

---

[4] A copy of the Policy has not been made a part of the summary
judgment record.

compliance with the Florida Building Code and suitability for use and occupancy, and on June 7, 2022, a Certificate of Occupancy was issued to GPF.  (Doc. #142-8.)

On June 17, 2022, as the result of a merger, IPC became the Sort Center's beneficial owner, replacing GPF.  (Doc. #116, ¶ 24.)

### (6)  Hurricane Ian

Hurricane Ian made landfall in Southwest Florida on September 28, 2022.  During the storm, access panels on a majority of sixteen allegedly defective 20-ton RTUs were torn off by high winds, leaving them exposed to the elements.  (Doc. #156-1, ¶ 6.)  Flying metal debris also left rips, tears, and punctures in the rubber single-ply TPO membrane of the Sort Center's roof.  (Id.)  That, in turn, damaged the Sort Center's interior, as water seeped through the roof.  (Id. at ¶ 9.)

### (7)  Insurance Claim and Emergency Repairs

IPC filed a first-party insurance claim with Employers on October 3, 2022.  (Id. at ¶ 3.)  The next day, an Employers adjuster participated in a conference call with IPC and a disaster restoration and mitigation company.  (Id. at ¶ 8.)  The discussion included the need for immediate emergency repairs to mitigate the widespread roof damage and prevent further water intrusion into the Sort Center.  (Id. at ¶¶ 8-9.)  The adjuster approved the emergency repairs.  (Id. at ¶ 9.)  The emergency roof repair was completed on October 8-9, 2022.  (Id. at ¶ 10).

**(8)   The § 558.004 March Notice to Rogers, Conlan, and Trane**

On March 24, 2023, IPC sent a document titled "CHAPTER 558 NOTICE OF DEFECT CLAIM" to Rogers, Conlan, and Trane ("the March Notice").  (Doc. #93-3, p. 2.)   The March Notice reminded the recipients of their roles as "general contractor," "mechanical contractor," "installe[r]," and "manufacture[r]" of the RTUs. (Id.)  It informed them of alleged "defects in the design and/or manufacture of, and/or the installation of the RTUs."  (Id.)   It continued:  "The exterior handles and panels on many of the RTUs failed, causing the panels to tear off the units causing significant damage to the surrounding roof.  Further, the RTUs themselves suffered additional damage as a result of the missing panels."  (Id. at 2-3.)   The March Notice closed by notifying the recipients of their various rights and duties under Chapter 558 and of their duty to preserve evidence.  (Id. at 3-4.)  BLC opines that the March Notice "appears to comply with the requirements of Chapter 558, Florida Statutes" (Doc. #141, pp. 10-11), and the Parties agree that the March Notice was not served on BLC.

**(9)   The Status of the Repairs**

The completion status of the repairs is difficult to pinpoint from the record.  The Sort Center's tenant, Amazon, hired an HVAC contractor to make emergency repairs to the RTUs.  Based on invoices in the record (Doc. #156-5), those emergency RTU repairs appear to have been completed on February 3, 2023.

BLC asserts, however, that the construction defects were
completely repaired between April and May 2023, based on a Roofing
Invoice (Doc. #142-7) from Roofing Solutions, Inc., and a Change
Order (Doc. #142-6) issued by Barber & Associates, Inc., (Doc.
#141, p. 11.)  BLC also asserts that a roof replacement and repairs
to the RTUs were "completed" before November 2, 2023 (id.), based
on Subrogees' allegations in Paragraphs 29 to 31 (Doc. #116, ¶¶
29-31) of the TAC, (Doc. #141, p. 11.)

After reviewing BLC's proffered evidence, and in light of the
governing standard of review, the Court concludes that BLC has not
established that repairs to the roof or the RTUs were "completed"
before this lawsuit was filed on September 22, 2023.

**(10)  The August Letter to BLC**

On August 11, 2023, an attorney retained by Employers and
Underwriters sent a letter to BLC titled "NOTICE OF POTENTIAL CLAIM
AND JOINT LABORATORY EXAMINATION – AUGUST 31, 2023 STARTING AT
9:00 A.M" (the "August Letter") (Doc. #156-7, p. 1.)  The August
Letter reminded BLC of its involvement "in the design and
specifications of the building, including the mechanical systems."
(Id.)  It also informed BLC that Employers and Underwriters had
retained the attorney and his firm to protect their subrogation
interests arising from the loss at the Sort Center.  (Id.)  The
August Letter then stated that

[b]ased upon the investigation to date, it appears that

the [RTU] and roof damage may have been caused by
deficiencies in components to multiple Trane [RTUs].
Specifically, panels from certain [RTUs] came off the
units and damaged the building's roof membrane and
associated components.

(Id.)  The August Letter continued by informing BLC that Subrogees
had scheduled a "joint laboratory exam of the retained artifacts
on August 31, 2023," at a specified location, and provided BLC
with relevant contact information.  (Id. at 2.)  Finally, the
August Letter noted that "[d]epending on the results of the
investigation, [Subrogees] may assert claims against you for
losses resulting from this incident. We would suggest that you
forward a copy of this letter to your company's liability insurance
carrier and ask them to contact our office."  (Id.)

### (11) The Joint Laboratory Examination and September Email to BLC

BLC initially declined Subrogees' invitation to attend the
joint examination.  On August 16, 2023, BLC's General Counsel
emailed Subrogees' attorney, stating that BLC "will not be
attending the August 18 Joint Laboratory Examination." (Doc. #156-
8, p. 3.)  Instead, BLC expressed an interest in receiving a copy
of the "inspection video when it has been completed."  (Id.)

The joint examination was rescheduled to September 21, 2023.
(Id. at 2.)  In a September 5, 2023, email (the "September Email")
informing BLC of the change, Subrogees explained that BLC's
apparent "failure to specify vibration/hurricane rated latch

assemblies may be a potential cause of this incident." (Id.) Although Subrogees "underst[oo]d that BLC ha[d] elected not to attend the exam," they suggested that "[BLC] may wish to reconsider." (Id.)  BLC did reconsider.  On September 11, 2023, BLC informed Subrogees that its Executive Director would attend the rescheduled joint exam.  (Id. at 1.)

The rescheduled joint examination took place on September 21, 2023, attended by BLC. On September 26, 2023, Subrogees emailed all of the attendees, including BLC, a link to the results, which included metallurgical data.  (Doc. #156-9, p. 1; #156-10, p. 2.)

### (12) **The Lawsuit Begins**

Subrogees sued multiple parties, including BL Companies Connecticut, Inc. ("BLC-CT"), on September 22, 2023.  (Doc. #2.)

On October 31, 2023, BLC-CT filed a motion to dismiss, or in the alternative, to stay the proceedings.  (Doc. #39.)  BLC-CT asserted that Subrogees had failed to comply with Chapter 558's notice provisions, and therefore could not state a claim.  (Id. at 3-6.) Alternatively, BLC-CT sought a stay to allow time for Subrogees to comply with Chapter 558 and for the parties to reach an amicable settlement.  (Id. at 6-9.)

### (13) **The November Notice**

On November 2, 2023, Subrogees served a document on BLC titled "Notice of Claim pursuant to Section 558.004, Florida Statutes" ("the November Notice").  (Doc. #156-10, p. 1.)   The November

Notice echoed the August Letter, but provided more detail after the recent joint examination.  It stated that

> door panels for the compressor compartment of certain 20-ton [RTUs] on the Warehouse's roof broke at the door latch and came off the RTUs to damage the units themselves and damaged the Warehouse's rubber membrane roof and other property located on the roof of the Warehouse and property inside the Warehouse.  The investigation of the loss reveals that the panel latches for the [RTUs] were not rated for 160 mph winds, as required by the Florida Building Code.

(Id.)  The November Notice referenced the August Letter, BLC's rejection of the first invitation to participate in the joint examination, BLC's acceptance of the second invitation, and BLC's access to metallurgical data from the rescheduled exam.  (Id. at 1-2.)  Subrogees extended another invitation to BLC to inspect the RTUs and the Sort Center within 30 days.  (Id. at 2.)  The November Notice closed by describing the damages that Subrogees sought, with supporting documents in a link, and notified BLC of its rights and duties under Chapter 558.  (Id. at 2-3.)

### (14) The Agreed Stay

On November 30, 2023, the Court held a preliminary pretrial conference.  (Doc. #66.)  At that conference the parties "resolved" BLC-CT's pending motion to dismiss or to stay by "agreeing to . . . stay discovery until January 2, 2024."  (Doc. #67.)  A stay was entered on November 30, 2023, and lifted on January 2, 2024.  (Id.)

### (15) BLC's December 2023 Inspection of Sort Center

On December 8, 2023, pursuant to the November Notice, BLC

inspected the Sort Center, the RTU units, and the repairs.  (Doc. #156-12 p. 2.)  In a December 14, 2023, follow-up letter, and in response to the November Notice, BLC's counsel stated that (1) the Notice was untimely, (2) the repairs had already been completed, and (3) Plaintiffs' "spoliation of the evidence has prejudiced BLC and contravened not only the protections afforded BLC under the statute, but the public policy underlying such protections." (Id.)

### (16) The Substitution of BLC for BLC-CT

On March 13, 2024, Subrogees filed an unopposed motion for leave to file a second amended complaint.  (Doc. #77.)  In support of the motion, BLC provided an affidavit from its General Counsel (Doc. #77-1) explaining that Subrogees had incorrectly sued BLC-CT instead of BLC; that BLC has various wholly owned entities, including BLC-CT, but that BLC-CT was not involved in the facts giving rise to this dispute; and that BLC had received the November Notice, which, for the purposes of litigation, BLC would "consider . . . as having been addressed to [BLC]," despite its references to BLC-CT.  (Id. at ¶¶ 6-14.)  The Court granted Subrogees' motion, and a Second Amended Complaint (Doc. #83) was filed on April 11, 2024, substituting BLC as a defendant.

The operative pleading is now the TAC (Doc. #116), which asserts two counts against BLC.  Count I asserts a claim for Professional Negligence against BLC for failing to conform to the applicable professional standard of care when it researched,

selected, detailed, and gave specifications for the RTUs in its
design documents.  Count II asserts a claim of Violation of Florida
Building Code § 553.84 against BLC for improperly selecting and
providing specifications for the RTUs, which were not rated for
160mph winds.  Plaintiffs have clarified that the only construction
defects alleged "are solely comprised of the RTUs' door latches
and their component parts."  (Doc. #155, p. 19; id. at 12.)

### III.

In its Motion for Summary Judgment (Doc. #141) BLC seeks
summary judgment on its first and eighteenth affirmative defenses.
"A federal court sitting in diversity jurisdiction applies the
substantive law of the forum state [] alongside federal procedural
law."  Med. & Chiropractic Clinic, Inc. v. Oppenheim, 981 F.3d
983, 989 (11th Cir. 2020).  The parties agree, or at least do not
dispute, that the substantive law of Florida applies in this
diversity case.

### A.  First Affirmative Defense: Non-Compliance with Fla. Stat. § 558.004

BLC's First Affirmative Defense asserts that Plaintiffs'
action "is barred based on repairs made prior to compliance with,
or initiation of, the process outlined in Chapter 558, Florida
Statutes, such being an incurable failure of conditions
precedent."  (Doc. #122, p. 7.)

BLC argues that: (1) it was entitled to the statutory process

described in Chapter 558, including those of Section 558.004; (2)
Chapter 558's statutory process is a condition precedent to filing
suit; (3) Plaintiffs repaired the alleged defects or deficiencies
before commencing the Chapter 558 process against BLC; (4)
Plaintiffs initiated this action without service on BLC of required
pre-suit notice; (5) as a result, BLC was denied its statutory
opportunity to inspect the alleged defects prior to their repair
and to cure or repair them; and (6) this action may not proceed to
trial on any unnoticed defects or when Plaintiffs have not strictly
complied with these statutory procedures.  (Doc. #141, pp. 2-3.)
BLC asserts that it is thus entitled to summary judgment.

Subrogees respond that BLC was provided adequate pre-suit
notice and had opportunities to inspect the alleged construction
defects and repairs.  Subrogees also assert that Section 558.004
does not prohibit a claimant from making emergency repairs to
mitigate further damage.  As a result, Subrogees argue that no
summary judgment is warranted.  (Doc. #155, pp. 2, 19-25.)

**(1)  Florida Construction Defect ADR Procedures**

The Florida Legislature has determined it "beneficial to have
an alternative method to resolve [certain] construction disputes
that would reduce the need for litigation [and] protect the rights
of property owners."  Fla. Stat. § 558.001.  It has concluded that
such an alternative dispute resolution ("ADR") method should
"involve the claimant filing a notice of claim" and "provide . . .

- 16 -

an opportunity to resolve the claim through confidential
settlement negotiations without resort to further legal process."
Id. The Legislature has enacted that ADR mechanism in Chapter 558
of the Florida Statutes.  Id.

The Florida Supreme Court describes Chapter 558 as creating
the following "procedural requirements before a claimant can file
an action for a construction defect," Altman Contractors, Inc. v.
Crum & Forster Specialty Ins. Co., 232 So. 3d 273, 276 (Fla. 2017):

> [A] claimant must serve written notice of claim on the
> contractor, subcontractor, supplier, or design
> professional, as applicable before the claimant may file
> an action for a construction defect.
>
> . . .
>
> Upon receipt of a chapter 558 notice of claim, the
> recipient must serve a written response to the claimant
> within the statutorily specified time-period, providing
> either an offer to remedy the alleged construction
> defect at no cost to the claimant, to compromise and
> settle the claim by monetary payment, to compromise and
> settle the claim by a combination of repairs and monetary
> payment, a statement disputing the claim, or a statement
> that any monetary payment will be determined by the
> recipient's insurer. Once the claimant receives a timely
> settlement offer, the claimant must accept or reject the
> offer in writing.
>
> [T]he claimant may, without further notice, proceed with
> an action against the recipient if the parties either
> agree to a partial settlement or compromise of the claim,
> the recipient disputes the claim and will neither remedy
> the defect nor compromise and settle the claim, or the
> claimant does not receive a response within the time
> provided. If the offeror satisfies the parties'
> agreement within a reasonable period of time, the
> claimant is barred from proceeding with an action for
> the claim described in the notice of claim or as
> otherwise provided in the accepted settlement offer.
> [A]ny offer or failure to offer . . . to remedy an

> alleged construction defect or to compromise and settle
> the claim by monetary payment does not constitute an
> admission of liability with respect to the defect and is
> not admissible in a subsequent lawsuit. If a claimant
> initiates an action without first accepting or rejecting
> the offer, the court shall stay the action upon timely
> motion until the claimant complies with this subsection.
> In the event of . . . litigation, the trial court may
> order sanctions for failing to provide requested
> discovery during the chapter 558 process.

Altman Contractors, 232 So. 3d at 276–77 (internal quotation marks,

citations, and footnotes omitted.)

If Chapter 558 applies to a dispute, its procedural steps are

mandatory.  "A claimant may not file an action subject to [Chapter

558] without first complying with [its] requirements." Fla. Stat.

§ 558.003.  The statutory remedy for failure to comply with Chapter

558's procedures, however, is not dismissal of the action or

judgment against the non-compliant plaintiff.  Hebden v. Roy A.

Kunnemann Const., Inc., 3 So. 3d 417, 419 (Fla. 4th DCA 2009) ("The

statute does not forfeit substantive rights as a penalty for

noncompliance; it is expressly limited in scope.")  Rather, Chapter

558's only remedy for noncompliance is permitting a stay of the

court proceedings on timely motion to allow compliance.

> If a claimant files an action alleging a construction
> defect without first complying with the requirements of
> this chapter, on timely motion by a party to the action
> the court shall stay the action, without prejudice, and
> the action may not proceed until the claimant has
> complied with such requirements.

Id. § 558.003.  Thus, if a "claimant" files an "action" alleging

a "construction defect," id. § 558.002(1),(3),(5)(d), on a timely

motion, the trial court <u>must</u> grant a motion for a stay.  <u>Moss &</u> <u>Assocs., LLC v. Peterson</u>, No. 3D24-2118, 2025 WL 615093, at *3 (Fla. 3d DCA Feb. 26, 2025).  In addition, an action may not proceed to trial except on defects that are "noticed" in compliance with Chapter 558.  Fla. Stat. § 558.004(11).[5]

**(2)  Analysis of Compliance with Chapter 558**

The Court agrees with BLC (Doc. #144, p. 7) that the Chapter 558 process applies to the claims in this case.[6]  Plaintiffs are "claimants," this case is an "action," and this action involves a "construction defect" within the meaning of Section 558.002(1), (3), and (5).  Thus, the statutory processes described in Chapter 558, including those of Section 558.004, apply to these events.

The Court also agrees with BLC that the Chapter 558 process is a mandatory condition precedent for those claims that fall within its scope.  <u>Gindel v. Centex Homes</u>, 267 So. 3d 403, 406-07 (Fla. 4th DCA 2018).  The Court disagrees with BLC's arguments, however, that failing to give pre-suit or pre-repair notice bars this action from being pursued in court.

BLC argues that a timely Chapter 558 notice prior to

---

[5] Similarly, the action cannot proceed on reasonably or causally related defects unless the underlying defect has been "noticed." <u>Id.</u> § 558.004(11).

[6] Because Plaintiffs do not assert otherwise, the Court assumes without deciding that under <u>Erie</u> and its progeny, Chapter 558 applies in this diversity case.  <u>See</u> <u>Oppenheim</u>, 981 F.3d at 989.

litigation is a condition precedent that must be proven by
Plaintiffs, and that no Chapter 558 notice was provided to it until
November 2023. (Doc. #141, pp. 11-12.)[7] By that time, BLC argues,
it was impossible to complete the Chapter 558 pre-suit process
because the construction defects had purportedly already been
fully repaired. (Id. at 14-15.)

BLC relies on a Florida trial court order in Savoy v. Larry
Lake & Assoc., Inc., which was affirmed in a per curiam decision,
id. 310 So. 3d 403 (Fla. 4th DCA 2021)(Table)), as well as other
statutes with pre-suit notice requirements. (Doc. #141, pp. 15-
17.) BLC asserts that since the defects were already repaired
when it received notice, any post-repair notice "is illusory."
(Id. at 18.) BLC maintains that "compliance [with the requirements
of Chapter 558] is not merely procedural, but rather substantive
since failure of compliance also serves as a defense." (Id. at 7-
8.) To BLC, the issue is simple – "no notice for a defect, no
trial for that defect." (Id. at 14.)

The short answer is that BLC is incorrect because the failure
to comply with Chapter 558 is not a defense at all. As the statute
states, Chapter 558 "does not" "create any new defense, except as

_____

[7] BLC asserts that Plaintiffs "did *not* provide notice to BLC
prior to repairing the alleged defects to the Project." (Id. at
12, emphasis in original.) "BLC received no notice prior to the
Owner's repair of the defects now alleged against BLC. . . . Only
*after* this Court's November 30, 2023, Order did BLC receive the
Plaintiffs' 558 Notice." (Id. at 14 (emphasis in original)).

specifically provided." Fla. Stat. § 558.004(12). BLC has not
identified a "specifically provided" affirmative defense in
Chapter 558 upon which it can rely.

The not-so-short answer is that plaintiffs have at least
arguably sufficiently complied with the Chapter 558 procedures.
As set forth above, the record establishes the following relevant
chronology:

- On September 28, 2022, Hurricane Ian made landfall
  in Southwest Florida, and caused damage to the RTUs
  and the Sort Center;

- On October 3, 2022, IPC filed a first-party
  insurance claim with Employers;

- On October 4, 2022, Employers' adjuster approved
  immediate emergency repairs;

- On October 8-9, 2022, the emergency repairs to the
  RTUs were completed;

- On March 24, 2023, IPC sent a "CHAPTER 558 NOTICE
  OF DEFECT CLAIM" to Rogers, Conlan, and Trane (but
  not to BLC);

- On August 11, 2023, counsel for Subrogees sent a
  letter to BLC titled "NOTICE OF POTENTIAL CLAIM AND
  JOINT LABORATORY EXAMINATION – AUGUST 31, 2023
  STARTING AT 9:00 A.M";

- On September 21, 2023, the joint examination was
  conducted, with BLC in attendance; and

- On September 22, 2023, Plaintiffs filed suit
  against multiple parties, including BLC-CT.

Plaintiffs maintain that the August Letter satisfied the
requirements of Chapter 558 notice prior to the September lawsuit.
(Doc. #155, p. 20.) BLC disagrees that the August Letter

- 21 -

constituted proper notice under Chapter 558.

Chapter 558 requires a claimant to serve "written notice of claim" on any potential defendants, including "design professional[s.]" Fla. Stat. § 558.004(1)(a). The written notice must "refer to this chapter." Id. It must also "describe in reasonable detail the nature of each alleged construction defect and, if known, the damage or loss resulting from the defect." Id. § 558.004(1)(b). The notice "must identify the location of each alleged construction defect sufficiently to enable the responding parties to locate the alleged defect without undue burden." Id.

The August Letter to BLC satisfies all of the notice requirements of Section 558.004(1)(a) and (b) except one: it does not refer to Chapter 558. While BLC argues that strict compliance with Chapter 558 is required, the Court's review of Florida caselaw indicates that substantial compliance suffices. Hebden, 3 So. 3d at 419 (holding that the "failure to strictly comply with Chapter 558 d[oes] not forfeit the[] right to seek [] offset damages"); Banner Supply Co. v. Harrell, 25 So. 3d 98, 100, n.4, n.5 (Fla. 3d DCA 2009) (concluding that a defendant had no occasion to complain of the claimants' "fail[ure] to [provide] notice and opportunity to inspect prior to filing suit," when the defendant itself did not comply with "statutory time and notice requirements" (citing Angrand v. Fox, 552 So.2d 1113, 1115, n.4, n.6 (Fla. 3d DCA 1989) (collecting cases) (explaining that the defendants received "due

notice," notwithstanding the claimants' "deviation" from the
process "specified in the statute"))); Phoenix Ins. Co. v.
McCormick, 542 So. 2d 1030, 1032 (Fla. 2d DCA 1989) (agreeing that
when defendants receive "actual notice within the meaning of the
statute although not in strict compliance with it, it has been
complied with.")

BLC received the August Letter and September Email and
attended the joint lab examination all before this litigation.
BLC then received the November Notice, which clearly references
Chapter 558, and obtained the joint lab results shortly after this
litigation began.  But even before receiving the November Notice,
BLC attested to its "aware[ness] of the requirements of section
558.004, Florida Statutes, which set forth the pre-suit 'Notice
and Opportunity to Repair' requirements."  (Doc. #40, ¶ 4.)
Therefore, BLC has not shown that it was prejudiced by the
technical defect — no express reference to Chapter 558 – in the
August Letter.  The Court thus concludes that Plaintiffs have
substantially complied with Chapter 558's pre-suit notice
requirements, obviating the need for a further stay.

The remedy BLC seeks for Plaintiffs' purported non-compliance
is also not supported by the statute.  BLC asserts that Chapter
558 "mandates [the notice and repair] procedure and **bars** actions
for which compliance has not occurred."  (Doc. #141, p. 14.)  But
there is only one circumstance in which a "claimant is **barred**"

from proceeding with an action under Chapter 558; that is, "[i]f [there is a settlement where] the offeror makes payment or repairs the defect within the agreed time and in the agreed manner." Id. § 558.004(8) (emphasis added). The remedy otherwise available for noncompliance under Chapter 558 is a stay of judicial proceedings, and even then, only on a "timely" motion.[8] Moreover, with the notable exception of subsection (8), Chapter 558 otherwise indicates that remedies for noncompliance are to be provided without prejudice to a claimant. Id. § 558.003 ("without prejudice"); id. § 558.004(11) ("Nothing in this subsection shall preclude subsequent or further actions"); Hebden, 3 So. 3d at 419 ("The statute does not forfeit substantive rights as a penalty for noncompliance").

BLC's reliance on a one-page order by a state trial court (Doc. #143-1, p. 2), affirmed in a one-word per curiam opinion, Savoy v. Larry Lake & Assocs., Inc., 310 So. 3d 403 (Fla. 4th DCA 2021), is misplaced. "Trial courts do not create precedent" and "a per curiam affirmance, is of no precedential value whatsoever." Vachon v. Travelers Home & Marine Ins. Co., No. 2D2023-2674, 2025 WL 500291, at *2-3 (Fla. 2d DCA Feb. 14, 2025)(citations omitted.)

---

[8] Id. § 558.004(7) ("If a claimant initiates an action without first accepting or rejecting [a timely settlement] offer, the court shall stay the action upon timely motion"); id. § 558.003 ("If a claimant files an action alleging a construction defect without first complying with the requirements of this chapter, on timely motion by a party to the action the court shall stay the action").

BLC also asserts that summary judgment is required where repairs have already been completed, but cites to no authority on that point. The statute itself cuts against BLC's assertion: Section 558.004 "does not prohibit or limit the claimant from making any necessary emergency repairs to the property as are required to protect the health, safety, and welfare of the claimant." Fla. Stat. § 558.004(9). And to the extent that BLC suggests that the repairs here were not "emergency" repairs (Doc. 141, pp. 17–18), that is a question of fact for a jury to resolve.

The Court also rejects BLC's assertion that even if "the repairs occurred on an emergency basis, *nothing* in the statute relieved [Subrogees] from providing BLC notice and access at the time of the repairs." (Id. at 16.) To the contrary, the statute clearly states that "[t]his section" – i.e., Section 558.004 – "does not prohibit or limit" a claimant from making emergency repairs. Fla. Stat. § 558.004(9) (emphasis added). Thus, when emergency repairs are needed, subsection (9) carves out the entire "section" — including the "notice" and "access" provisions.

Therefore, as to this issue, BLC's motion for summary judgment is **DENIED**.

**B. Eighteenth Affirmative Defense: Contractual Waiver of Damages**

BLC's Eighteenth Affirmative Defense asserts that "BLC and [GPF], the predecessor in interest to Plaintiffs' subrogor, entered into a contract effective October 26, 2020; pursuant to

- 25 -

the terms of said contract, the damages sought by Plaintiffs
against BLC have been waived." (Doc. #122, p. 12.)

BLC argues that: (1) damages are required elements of both
causes of action raised against it in the TAC; (2) contracting
parties may agree to limit or waive damages, and such agreements
are enforceable; (3) the Contract between BLC and GPF contains an
enforceable subrogation waiver for damages covered by insurance;
(4) all the damages in this case are covered by insurance, so they
are contractually waived; and (5) with no damages there can be no
viable causes of action against BLC.

Subrogees respond that: (1) the Contract contained in the
summary judgment record is not competent evidence because it is
incomplete, unsigned, and unauthenticated; and (2) the subrogation
waiver is not enforceable for losses that occurred after
construction at the Sort Center was completed.

**(1)  The Contract**

On October 26, 2020, GPF and BLC agreed to a contract under
which BLC was to provide architectural, mechanical, engineering,
and plumbing design services for the Sort Center (the "Contract").
The Contract attached to BLC's summary judgment motion (Doc. #142-
9) is based on a standard form, AIA® Document B102™-2017, but the
parties made many additions and deletions. (Id. at 11-20.) The
Contract is signed (id. at 10), but the Additions and Deletions
Report is unsigned, (id. at 21.)

- 26 -

Article 1 of the Contract describes BLC's responsibilities. Section 1.5 and its subparts required BLC to maintain insurance, including Commercial General Liability, Employers' Liability, and Professional Liability, "as set forth on Exhibit B attached hereto." (Id. at 3.) "Exhibit B" of the Contract is not attached or otherwise found in the summary judgment record.

Article 4 of the Contract relates to claims and disputes. (Id. at 5.) Section 4.1.2 provides: "To the extent damages are covered by property insurance, the Owner and Architect waive all rights against each other . . . for damages . . ." (Id.)

But Section 4.1.2 continues with an exception: "except such rights as [the parties] may have to the proceeds of such insurance as set forth in AIA Document A201-2017, General Conditions of the Contract for Construction or general conditions of another form of construction contract utilized by the Owner." (Id.) Of note, the clause beginning with "or general conditions . . ." was specifically added by the contracting parties. (Id. at 14.) BLC has not placed AIA Document A201-2017 into the record or provided "another form of construction contract" that describes the scope of Section 4.1.2's exception to the subrogation waiver.

**(2)   Subrogation Waiver Principles**

"Generally, when an insurer pays the claim of its insured, the insurer stands in the shoes of its insured, and the insurer may bring a subrogation action against the tortfeasor to recover

the amounts paid under the insurance policy." State Farm Fla.
Ins. Co. v. Loo, 27 So. 3d 747, 748 (Fla. 3d DCA 2010). "Such
subrogation matters are routine, and most insurance policies
contain language that the insured cannot waive its rights against
a third party in a way that frustrates the insurer's right of
subrogation." United States Aviation Underwriters, Inc. v.
Turnberry Airport Holdings, LLC, 359 So. 3d 1207, 1208 (Fla. 3d
DCA 2023). However, many commercial contracts have anti-
subrogation provisions in which the parties agree to waive any
claims against each other. Id. Such subrogation waivers are
generally enforceable in Florida and will bar an insurer from
maintaining a subrogation action if: (1) the underlying provision
is not "obscure and indefinite"; and (2) the co-insured party has
an "insurable interest" at the time of the loss. Fairchild for
Use & Benefit of State Farm Fire & Cas. Co. v. W. O. Taylor Com.
Refrigeration & Elec. Co., 403 So. 2d 1119, 1120-21 (Fla. 5th DCA
1981) (citing Tout v. Hartford Accident & Indem. Co., 390 So.2d
155 (Fla. 3d DCA 1980)); Cont'l Ins. Co. v. Kennerson, 661 So. 2d
325, 330 (Fla. 1st DCA 1995).

**(3)  The Contract Can be Considered**

Plaintiffs object that the Court cannot consider the Contract
filed in support of BLC's summary judgment motion. Plaintiffs
assert that the version of the contract in the record is partially
unsigned, missing key attachments, and has not been authenticated.

- 28 -

Rule 56(c)(2) provides that a "party may object that the material
cited to support or dispute a fact cannot be presented in a form
that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).
In deciding a summary judgment motion, the Court may consider
evidence which can later be reduced to admissible form. <u>Jimenez
v. Dep't of Homeland Sec.</u>, 119 F.4th 892, 900 (11th Cir. 2024),
citing <u>Rowell v. BellSouth Corp.</u>, 433 F.3d 794, 800 (11th Cir.
2005). Under some circumstances, even a document not contained in
the summary judgment record may be considered by the Court. <u>Adams
v. Demopolis City Sch.</u>, 80 F.4th 1259, 1266 n.5 (11th Cir. 2023)
(admitting a diary entry not included in record because the entry
had been read in a deposition that was part of record).

The Court agrees with BLC that it may consider the Contract
as it appears in the summary judgment record. The Court takes
BLC's Counsel at his word that the Contract as submitted can be
"reduced to admissible form." This includes the attachments to
the Contract that are currently missing from the record. Thus,
Plaintiffs' objection on this basis is overruled.

**(4)  Insufficiency of the Evidence**

The real problem is not whether the Contract may be considered
by the Court, but whether what BLC has provided is sufficient to
establish an entitlement to summary judgment.

The standard version of Section 4.1.2 in the AIA® Document
B102™–2017 form contract was amended by the parties to add certain

language.[9]   Perhaps the contracting parties understood the scope

of the waiver and any applicable exceptions when signing the

Contract, such that Section 4.1.2 was or was not <u>subjectively</u> so

obscure and indefinite as to be unenforceable.   But there is

insufficient evidence — objective or subjective — in the summary

judgment record for the Court to reach that conclusion.

Although Section 4.1.2's scope is unclear, it seems evident

that the provision does not create an unlimited waiver of

subrogation rights.   It specifically excludes from the waiver "such

rights as [the parties] may have to the proceeds of such insurance

as set forth in AIA Document A-201-2017, General Conditions of the

Contract for Construction *or general conditions of another form of

construction contract utilized by the Owner.*"[10]   (Doc. #142-9, p.

5.)  BLC has not provided the Court with "AIA Document A-201-2017"

or "another form of construction contract" to support a finding

that Section 4.1.2's exception does not apply.   That gap is

significant.   BLC's contention that Section 4.1.2 bars this action

is contingent on first establishing that the exception does not

apply.   But again, BLC provides no evidence to support that

predicate determination, and has not even <u>asserted</u> that the

---

[9] <u>See</u> <u>infra</u> n.10 and referenced text.
[10] The italicized text was added by the contracting parties.
(Doc. #142-9, p. 14).   Thus, the ordinary mandate to "give effect
to all [language] of [a] contract," <u>Charlotte 650, LLC v. Phillip
Rucks Citrus Nursery, Inc.</u>, 320 So. 3d 863, 865 (Fla. 2d DCA 2021),
takes on special force.

exception is inapplicable.[11]

Grants of summary judgment on AIA construction contracts have been reversed for ambiguities in extrinsic documents or standards that are provided to a trial court for its consideration.    See

---

[11] The parties also dispute whether Section 4.1.2 of the Contract remained in force after construction was complete, i.e., whether the parties had an insurable interest at the time of loss:

> The normal and reasonable interpretation of such [subrogation waivers] is that the parties intended to cover that period of time during which both have an insurable interest in the structure and equipment. Here [the contractor's] interest needed protection because he was not to be paid at all until the units were installed and functioning. The parties could bargain for and shift the risk of loss as part of the construction contract. But after the contract was performed, and [the contractor] paid in full, the duty of the owner to insure for [the contractor's] benefit was likewise completed. There is no consideration for an on-going obligation of [the owner] to continue to insure his [property] for [the contractor's] benefit.

Fairchild, 403 So. 2d at 1121. BLC asserts that Employers Ins. Co. of Wausau v. Hera GmbH & Co. KG, 2008 WL 11333564, *3 (S.D. Fla Oct. 1, 2008) favors its own position. (Doc. #160, p. 6.) But the court there was "not convinced" that a subrogation waiver almost identical to the one at issue here "extend[ed] to post-construction claims." Id. (concluding that an agreement to "waive all rights against each other and each of their subcontractors, sub-contractors, officers, directors, agents, and employees for recovery for damages caused by fire and other perils to the extent covered by builders['] risk or property insurance . . . [did] not bar the subrogation claims"). BLC also contends that Section 4.1.1 of the Contract suggests that Section 4.1.2 remained enforceable after the completion of construction. But Section 4.1.1 turns on the phrase "the Work," which Hera GmbH determined is "used [in AIA contracts] to refer to construction through completion, not to the completed project." Id. At any rate, the scope and effect of Section 4.1.2's exception and waiver are still unclear. Given that evidentiary vacuum, the Court cannot conclude that Section 4.1.2 remained in force after construction was complete without improperly drawing inferences in BLC's favor.

<u>Sch. Bd. of Orange Cnty. v. Se. Roofing & Sheetmetal, Inc.</u>, 532 So. 2d 1353, 1353-54 (Fla. 5th DCA 1988) (concluding that a trial court erred by granting summary judgment on an AIA form contract's payment provision that incorporated an external document whose terms were "not clear").  The same result must hold when an AIA construction contract references crucial, extrinsic documents that are <u>never</u> provided to a trial court at all.

Because the scope and effect of Section 4.1.2's exception and thus, the subrogation waiver, are unclear, the Court lacks a factual basis to conclude that this action is barred.

Therefore, on this issue as well, BLC's motion for summary judgment is **DENIED**.

Accordingly, it is now

**ORDERED:**

Defendant BL Companies, Inc.'s Motion for Summary Judgment (Doc. #141) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this <u>7th</u> day of April 2025.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Parties of record